# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-09-02395-TUC-FRZ-DTF |
| Plaintiff, | |
| vs. | **AMENDED REPORT AND RECOMMENDATION** |
| Jesus Lorenzo Ruiz-Kempton, Raymond Gabriel Ortega, and Luis Miguel Lopez, | |
| Defendants. | |

Pending before the Court is Defendant Luis Miguel Lopez's Motion to Suppress Evidence and Statements (Doc. 29) and Defendants Jesus Lorenzo Ruiz-Kempton's and Raymond Gabriel Ortega's Motion for Joinder with Co-defendant's Motion to Suppress (Docs. 30, 39). The government responded in opposition. (Doc. 31.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendants' motion to suppress was set for evidentiary hearing and evidence was heard on October 5, 2010. (Doc. 41.) This Court issued a Report and Recommendation on October 15, 2010. (Doc. 45.) Due to some audio skips in the testimony of Corporal Joseph Bunting, Senior District Judge Frank R. Zapata remanded the matter for the Court to re-hear testimony from that witness. (Doc. 58.) Additional testimony from Corporal Bunting was heard on March 4, 2011. (Doc. 68.) Considering all of the testimony, the Court issues an amended recommendation.

Defendants move to suppress evidence seized by the government alleging it is the fruit of Defendants' unlawful detention. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, GRANT Defendants Jesus Lorenzo Ruiz-Kempton's and Raymond Gabriel Ortega's Motion for Joinder with Co-defendant's Motion to Suppress (Docs. 30, 39) and DENY Defendant Luis Miguel Lopez's Motion to Suppress Evidence and Statements (Doc. 29).

## I. **FACTUAL FINDINGS**

On September 29, 2009, Immigration Customs Enforcement (ICE), Senior Special Agent (SSA) Eduardo Cota,[1] received a tip from a known reliable informant that a secret compartment to conceal marijuana in a truck was to be built at a residence in Nogales, Arizona. (RT 91-92, 99, 102, 129-30.)[2] The informant told SSA Cota that the compartment would be constructed within a stack of sheetrock. (RT 91, 100.) Acting on this tip, SSA Cota set up a surveillance at the identified residence. (RT 93, 100.)

Initially, SSA Cota noticed stacks of sheetrock in the front of the house and a flatbed truck parked in the driveway. (RT 93.) During the surveillance, he and other officers watched as the sheetrock was cut and then stacked onto a flatbed truck. (RT 94-95.) After the compartment was constructed, the flatbed was driven to a residence in Rio Rico, Arizona, and backed into the garage with the door partially closed. (RT 95, 106.) Surveillance officers could see people moving in and out of the rear portion of the flatbed truck where the compartment had been constructed. (RT 95.)

At the beginning of their shift that night, the Santa Cruz Sheriff's Department, including Corporal Joseph Bunting, was briefed that the Metro Task Force and ICE agents were working an investigation, which might require assistance stopping a vehicle. (RT 36.)

---

[1] SSA Cota has twenty-one years of law enforcement experience. (RT 91.)

[2] RT refers to the reporter's transcript of the evidentiary hearing held on October 5, 2010. (Doc. 44.)

1   Similarly, United States Border Patrol Agent William P. Akins was advised that the Metro
2   Task Force might be requesting his assistance to use his narcotics-detector dog to search a
3   vehicle suspected of transporting drugs.  (RT 7.)

4   Sometime after 5:00 a.m., on September 30, 2009, the flatbed truck left the residence
5   and was driven to a nearby intersection, where two new individuals got into the truck.  (RT
6   96-97.)  The flatbed truck then departed north.  (RT 97.)

7   A bit before 5:15 a.m., Corporal Bunting received a radio broadcast that ICE agents
8   were requesting help stopping an older model flatbed truck.  (RT 36-37, 48, 50.)  According
9   to Corporal Bunting, he understood that he was requested to stop the vehicle if he saw an
10  infraction.  (RT 37.)  Corporal Bunting assumed the vehicle was the subject of a drug
11  investigation given the task force's involvement.  (RT 36-37, 51.)  The flatbed truck passed
12  Corporal Bunting traveling 31 miles-per-hour in a 25 mile-per-hour zone.  (RT 38.)  Shortly
13  after 5:20 a.m., Corporal Bunting stopped the truck for speeding, walked to the passenger
14  side, and asked the occupants for their identification, vehicle registration, proof of insurance,
15  and destination.  (RT 38, 40-41.)  The occupants produced the requested documents and one
16  of the passengers responded, "Tucson" and the other passenger responded, "Green Valley."
17  (RT 41, 54, 57.)  Corporal Bunting then asked for clarification and one of the passengers
18  responded, "south of Tucson."  (RT 41, 57, 71.)  The driver, Defendant Ruiz-Kempton, did
19  not respond to Corporal Bunting because he did not speak English.  (RT 41, 54.)

20  Deputy Gonzales, a native Spanish speaker, heard Corporal Bunting's broadcast that
21  he was stopping the flatbed truck and came to assist.  (RT 16, 22, 32.)  Defendant Ruiz-
22  Kempton was escorted from the driver's seat to the back of the flatbed truck, where he was
23  interviewed by Deputy Gonzales. (RT 17, 41, 55.)  Ruiz-Kempton told Deputy Gonzales that
24  this was his first day on the job and that they were traveling to Green Valley, Arizona, to
25  work.  (RT 17.)  Ruiz-Kemptom said that the flatbed truck belonged to Defendant Lopez and
26  it had been parked at Lopez's home.  (RT 18.)  Deputy Gonzales then spoke with Lopez.
27  Lopez told Deputy Gonzales that Ruiz-Kempton had possession of the flatbed truck the
28

1  previous evening. (RT 19.) Lopez said that at about 4:30 a.m., Ruiz-Kempton and Ortega
2  picked him up in the flatbed truck and that they were going to meet someone else at a gas
3  station in Sahuarita. (RT 18-19.) Deputy Gonzales then interviewed Ortega. Ortega said
4  that Ruiz-Kempton had the truck the previous evening and that they had spent the night at
5  a hotel in Nogales. (*Id.*) Ortega said that he and Ruiz-Kempton picked up Lopez at his
6  residence earlier in the morning. (*Id.*)

7  Both Corporal Bunting and Deputy Gonzales noticed that Ruiz-Kempton was
8  extremely nervous. (RT 19-20, 43.) Deputy Gonzales noticed that Ruiz-Kempton avoided
9  eye contact while he interviewed him, and he believed Ruiz-Kempton might be lying or
10 withholding information. (RT 20.) Corporal Bunting also believed Ruiz-Kempton appeared
11 more nervous than he typically encountered during a routine traffic stop. (RT 43, 59.) He
12 noticed Ruiz-Kempton bit his lip and appeared pale. (RT 43.) Corporal Bunting and Deputy
13 Gonzales discussed their observations with Sgt. Matthews, who had arrived at the scene.
14 (RT 20, 43.) Sgt. Matthews requested a canine handler to inspect the exterior of the truck.
15 (RT 43.)

16 Border Patrol Agent Akins was nearby and responded to the scene with his narcotics-
17 detecting dog, Lara, within a few minutes. (RT 7.) Agent Akins walked his dog around the
18 truck and the dog alerted in the rear, where sheetrock had been staked on the truck's bed.
19 (RT 9.) A search disclosed marijuana hidden in a secret compartment carved out of the
20 sheetrock. (*Id.*) Defendants were arrested. Thereafter, Lopez made incriminating post-arrest
21 statements.

## II. DISCUSSION

23 Defendant Lopez seeks an order suppressing (1) the positive alert to the truck by the
24 narcotics detection dog, (2) the marijuana seized from the truck, and (3) Lopez's
25 incriminating post-arrest statements. (Doc. 29.) Defendants Ruiz-Kempton and Ortega join
26 in the motion to suppress the first two categories, the positive alert to the truck and the
27 marijuana. (Docs. 30, 39.)

28

Defendants argue that law enforcement officers violated their Fourth Amendment rights by detaining them longer than necessary to issue a speeding citation to the driver. Specifically, Defendants contend the delay caused by bringing the narcotic-detecting dog to the scene and walking the dog around the exterior of the truck exceeded the time necessary for investigating the traffic violation. (Doc. 29.) The government responds that the duration of the stop did not implicate any constitutional concerns and was reasonable in light of the collective knowledge of law enforcement. (Doc. 31.)

### 1. **Standing**

A defendant cannot challenge the legality of a detention unless his Fourth Amendment rights were violated. *United States v. Padilla*, 508 U.S. 77, 80-81 (1993). Here, the government concedes each defendant had standing to object to the seized evidence.

### 2. **Detention**

Defendants concede that the stop was lawful. It was predicated on an excessive speed violation (31 miles-per-hour in a 25 mile-per-hour zone). As applied to a traffic stop,

> "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, --- U.S. ----, ----, 129 S.Ct. 781, 788 (2009) (citation omitted).

In *Illinois v. Caballes*, 543 U.S. 405, 409 (2005), the Supreme Court made clear that a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Defendants agree that their detention was extended no more than 12 minutes. (RT 145, 150, 153.) Defendants claim this was an impermissible delay to obtain a narcotics-detection dog. The Court disagrees.

The government argues that collective knowledge of the various officers involved was sufficient to establish reasonable suspicion to believe criminal activity was afoot when the

traffic stop was extended. Under the collective knowledge doctrine, the aggregated knowledge of all the officers involved in the criminal investigation is evaluated to determine whether there was reasonable suspicion to detain the flatbed truck and its occupants. *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986). The collective knowledge doctrine is applicable where a group of officers with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion or probable cause, directed or requested that another officer, not previously involved in the investigation, conduct a stop, search, or arrest. *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007). The stop and detention here fall within the parameters of collective knowledge as set forth in *Sutton* and *Ramirez*.

At the evidentiary hearing, Defendants argued that SSA Cota had not directed or requested Corporal Bunting to stop the flatbed truck. Accordingly, they reasoned that Corporal Bunting could not rely upon the collective knowledge of the ICE agents to extend the traffic stop in order to have a narcotic-detecting dog exam the truck's exterior. The factual premise of this argument does not precisely reflect the testimony from the hearing.

According to Corporal Bunting, he had been informed the evening prior to the stop that ICE might need assistance with a traffic stop. (RT 36.) He testified that, the following morning, he was requested to "stop the vehicle if I saw the vehicle and saw an infraction, to pull over the vehicle." (RT 37.) SSA Cota testified that he had briefed the sheriff's deputies that he might need assistance conducting surveillance on a vehicle. (RT 118-19.) When the vehicle left the residence in the morning, SSA Cota provided the sheriff's deputies with the vehicle description and its direction of travel. (RT 117-19.) Although SSA Cota testified that his goal was to follow the vehicle to determine its ultimate destination, he acknowledged that Corporal Bunting's testimony – that he had been told to stop the vehicle if he saw a traffic infraction – was correct. (RT 119.) Therefore, Corporal Bunting was acting in response to a request from ICE when he stopped the vehicle.

The "collective knowledge rule applies where an officer makes an investigatory stop based in part on information **or** directions from other law enforcement officials," even if all

- 6 -

1  the information known is not communicated to the detaining officer. *United States v. Sutton*,
2  794 F.2d at 1426 (emphasis added). Here, ICE agents watched the truck as a secret
3  compartment was built within the sheetrock stacked on its bed.[3] The truck was followed to
4  another home where it reasonably appeared to ICE agents that the compartment was filled
5  with marijuana. All of this information was known to law enforcement officers when the
6  flatbed truck was detained by Corporal Bunting to obtain a narcotic-detecting dog. The facts
7  known to the ICE agents were sufficient to establish reasonable suspicion that criminal
8  activity was afoot when the truck was stopped and delayed for a narcotic-detecting dog to
9  arrive. This situation falls within the parameters of the collective knowledge doctrine as set
10 forth in *Ramirez*, therefore, the extended detention was not unlawful. 473 F.3d at 1037; *see
11 also United States v. Hensley*, 469 U.S. 221, 231-32 (1985) (holding that an officer may rely
12 on a wanted flyer, which is based on facts supporting a reasonable suspicion, to briefly detain
13 a person for an investigatory stop without any personal knowledge of those facts).

14       Additionally, the Court considers the additional knowledge obtained by Corporal
15 Bunting at the time of the stop.[4] *See United States v. Sutton*, 794 F.2d at 1426. Corporal
16 Bunting "didn't know the whole story about the vehicle," however, he knew "where the
17 source came from, our ICE and Metro Task Force" and that it most likely involved drugs.
18 (RT 36-37.) Corporal Bunting also observed that the driver was excessively nervous and the
19 passengers in the truck provided inconsistent statements about their destination. This
20 information, combined with the knowledge of the other agents and direction from ICE
21 agents, was sufficient to stop and briefly detain the flatbed truck and its occupants for the 12

---

[3]  In the written motion, Defendant Lopez disputes the reliability of the informant that provided the tip to SSA Cota. The Court does not address this issue because it does not rely on the tip to establish reasonable suspicion. Further, SSA Cota testified as to the informant's reliability.

[4]  The government conceded at the hearing that Corporal Bunting's knowledge alone was not sufficient to extend the traffic stop. (RT 135-37.)

- 7 -

minutes it took to use the narcotic-detecting dog to find the marijuana. *United States v. Sutton*, 794 F.2d at 1426.

### III. RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court GRANT Defendants Jesus Lorenzo Ruiz-Kempton's and Raymond Gabriel Ortega's Motion for Joinder with Co-defendants Motion to Suppress (Docs. 30, 39.) and DENY Defendant Luis Miguel Lopez's Motion to Motion to Suppress Evidence and Statements (Doc. 29).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-09-02395-TUC-FRZ.**

DATED this 10th day of March, 2011.

D. Thomas Ferraro
United States Magistrate Judge